[No. 42198.    En Banc.    December 12, 1974.]

MARCO DEFUNIS et al., *Respondents*, v. CHARLES ODEGAARD
et al., *Appellants*.

*Slade Gorton, Attorney General,* and *James B. Wilson,
Senior Assistant,* for appellants.

618

*Lycette, Diamond & Sylvester* and *Lyle L. Iversen,* for respondents.

HAMILTON, J.—In *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973), the minority admissions policy of the law school of the University of Washington was challenged upon equal protection grounds. We upheld the policy. Marco DeFunis, Jr. (hereafter referred to as plaintiff), sought review of our decision by the United States Supreme Court. Plaintiff's petition for certiorari was granted. Following submission of the cause, the Supreme Court determined that the controversy as between the parties had become moot, vacated our judgment, and remanded the cause to this court. The per curiam opinion rendered by the Supreme Court on April 23, 1974, reads in part as follows:

> Because the petitioner will complete his law school studies at the end of the term for which he has now registered regardless of any decision this Court might reach on the merits of this litigation, we conclude that the Court cannot, consistently with the limitations of Art. III of the Constitution, consider the substantive constitutional issues tendered by the parties. *Accordingly, the judgment of the Supreme Court of Washington is vacated, and the cause is remanded for such proceedings as by that Court may be deemed appropriate.*

(Footnote omitted. Italics ours.) *DeFunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 170-71, 94 S. Ct. 1704 (1974).

The mandate of the Supreme Court dated June 26, 1974, as amended by order of the court on June 24, 1974, in operative part, provides:

> AND WHEREAS, in the 1973 Term, the said cause came on to be heard before the SUPREME COURT OF THE UNITED STATES on the said transcript of record, and was argued by counsel:
> ON CONSIDERATION WHEREOF, it was ordered and adjudged on April 23, 1974, by this Court that the judgment of the Supreme Court of Washington be vacated, and that this case be remanded to the Supreme Court of the

State of Washington for such proceedings as by that Court may be deemed appropriate.

Now, THEREFORE, THE CAUSE IS REMANDED to you in order that such proceedings may be had in the said cause, in conformity with the judgment of this Court above stated, as accord with right and justice, and the Constitution and laws of the United States, the said writ notwithstanding.

In the interim, between the rendition of the opinion and the mandate of the Supreme Court, plaintiff moved in this court to designate this case as a class action and to reinstate the Superior Court judgment from which the original appeal was taken. Defendants in turn moved to reinstate the judgment of this court.

We perceive two questions arising out of these motions. First, does there exist a proper basis upon which to reinstate this case as a class action? Second, what disposition of this case should this court make in light of the opinion and mandate of the Supreme Court?

Before resolving these questions, it is appropriate to briefly summarize the relevant background facts.

In 1971, 1,601 applicants sought admission as first-year students at the University of Washington School of Law. Only 150 places were available for the incoming first-year class. Because of the attrition factor, some 330 were ultimately invited, of which 36 were minority group applicants with 18 of that group subsequently enrolling. Plaintiff as one of the 1,601 applicants was among the some 1,271 applicants denied admission. On his own behalf, and not as representative of any other person or class of persons, he instituted this suit in the Superior Court for King County challenging the university's minority admissions policy. He contended that, pursuant to the designated admissions policy, minority applicants with lesser qualifications than he were accorded admission preference thereby erecting a violation of the equal protection clauses of our state and federal constitutions. A 3-day trial in Superior Court ensued at the conclusion of which the trial judge on September 22,

1971, ruled in plaintiff's favor and directed that plaintiff be admitted to the law school.

The defendants promptly complied with the Superior Court order, and plaintiff commenced his studies as a law student. Subsequently, the defendants filed a notice of appeal to this court.

On March 8, 1973, we issued our opinion reversing the trial court and holding that "the minority admissions policy of the law school, and the denial by the law school of admission to plaintiff, violate neither the equal protection clause of the fourteenth amendment to the United States Constitution nor article 1, section 12 of the Washington State Constitution." *DeFunis v. Odegaard,* 82 Wn.2d 11, 37, 507 P.2d 1169 (1973). On May 16, 1973, we denied plaintiff's petition for rehearing and on May 24, 1973, plaintiff applied for a stay pending review of our decision by the Supreme Court of the United States. Mr. Justice Douglas of the Supreme Court granted the stay and plaintiff continued with his legal education. On February 26, 1974, the matter was argued before the Supreme Court and submitted.

During the course of oral argument before the Supreme Court, counsel for both parties, in response to questions from the bench, advised the court that plaintiff had registered, or was in the process of registering, for his final quarter in law school. Counsel for defendants also assured the court that regardless of the outcome in this proceeding his registration would not be abrogated or his graduation and receipt of his degree in anywise affected assuming he successfully completed the last quarter. Also, in response to a question from the bench, counsel for plaintiff advised the court that this was not a class action. With these assurances before it, the Supreme Court reached its conclusion of mootness upon the basis that "[t]he controversy between the parties has thus clearly ceased to be 'definite and concrete' and no longer 'touch[es] the legal relations of parties having adverse legal interests.'" 416 U.S. 312, 40 L. Ed. 2d 164, 169, 94 S. Ct. 1704 (1974), *citing Aetna Life Ins. Co. v.*

*Haworth,* 300 U.S. 227, 240-41, 81 L. Ed. 617, 57 S. Ct. 461, 1008 A.L.R. 1000 (1937). Having so concluded, the Supreme Court disclaimed authority to reach the merits, vacated our judgment, and remanded the cause to us for such further proceedings as we deemed appropriate.

All assurances concerning plaintiff's standing in the law school upon which the Supreme Court relied in reaching its disposition have come to pass. Plaintiff has successfully completed his final quarter, graduated, received his juris doctorate degree, and has applied for and has undoubtedly taken the Washington State Bar Examination on the same footing as any applicant with like qualifications. Upon successful completion of his bar examination, and certification to that effect by the Board of Governors of the Washington State Bar Association, plaintiff will be entitled to admission as a bona fide member of the bar of this state.[1]

Despite these now factual realities, plaintiff contends by his motion and in oral argument that this court should, for the first time in this protracted litigation, convert this case into a class action for the benefit of all persons in situations similar to his and all persons claiming to be excluded from the law school of the University of Washington by reason of preferences flowing to less qualified minorities under defendant's admissions policy. In conjunction with and as a part of his motion, plaintiff requests that we prescribe the manner in which notice shall be given to members of the class and, after such notice, rehear, reconsider, and overrule our original decision thereby affirming the initial judgment of the Superior Court.

We deny plaintiff's motion, thus answering the first question in the negative.

Paralleling Fed. R. Civ. P. 23(a), CR 23(a) succinctly sets forth the basic parameters for permissible class actions in the courts of the state of Washington. The rule provides:

>    *Prerequisites to a Class Action.* One or more members

---

[1] Since the drafting of this opinion, plaintiff has successfully completed the bar examination and been duly admitted to the practice of law in the state of Washington.

of a class may sue or be sued as representative parties on behalf of all *only* if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) *the representative parties will fairly and adequately protect the interests of the class.*

(Italics ours.)

CR 23 (c) (1) then requires:

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

■ Class actions are specialized types of suits, and as a general rule must be brought and maintained in strict conformity with the requirements of CR 23.

■ In evaluating the applicability of CR 23 (a) (4), the prerequisite that the interests of a purported class be fairly and adequately represented, one of the essential factors to be considered is the presence or absence of adversity within the asserted class. Conflicting or antagonistic interests among members of the alleged class in the subject matter of the litigation, necessitating a determination of priorities between class members, may render a class action an improper vehicle for seeking vindication of a given right. *Anderson v. Moorer,* 372 F.2d 747 (5th Cir. 1967); 7 C. Wright & A. Miller, *Federal Practice and Procedure* 638 (1972).

■ It may well be that at the outset of this litigation plaintiff could have declared and satisfied the trial court that he was an impartial representative of a class consisting of those applicants for admission to the law school who, like himself, were denied admission due to the operation and effect of the minority admissions policy. Consideration *being given,* however, to the number of applicants seeking admission, the limited available places, and the delicate and

necessarily individualized selective process, it could well be that plaintiff considered himself, or could have otherwise been considered, a competitor within rather than a representative of the class. Certainly, had plaintiff introduced this as a class action, the defendants would have been entitled to have the internal membership interests as well as the breadth and scope of the class explored and, if necessary, defined, and limited, as early in the litigation as practicable pursuant to CR 23 (c) (1). Nevertheless, and for whatever the reason, plaintiff understandably elected to pursue this action on his own behalf, rather than as a class action, up to and through the United States Supreme Court. To convert the suit to a class action at this late stage tends to contravene CR 23 (c) (1), disparage defendants' right to have an early definition and identification of the class, and projects practical and immeasurable uncertainties as to the present membership and size of the class as well as the relief which could be afforded. Such belated conversions to class actions are not favored. *Danner v. Phillips Petroleum Co.*, 447 F.2d 159 (5th Cir. 1971).

In a sense, his motion at this time amounts, in effect, to a request for a substitution of parties and a relitigation of the issues with respect to the substitutes, seemingly upon the basis of the record as it now stands before this court. This we do not deem appropriate.

In any event, plaintiff's successful entrance into law school and the completion of his studies has virtually removed him from his proposed class as a real party in interest. At this point in time, his interest on behalf of the class he expounds has become virtually academic, and any other class he would purport to represent, *i.e.*, applicants who had been admitted to and remained in law school pursuant to court order, would be small indeed. His contention that the procedure under which he was admitted and retained in law school somehow stigmatizes him is ephemeral, for the fact is that once in school he earned his grades and his degree by virtue of his intellectual capacity and diligent effort and not by virtue of any court decree. With his

degree in hand, he can rightfully and proudly stand on an equal footing with every member of his graduating class.

Plaintiff's alternative motion to reinstate the judgment of the Superior Court and defendants' motion to reinstate the judgment of this court raises, on the surface at least, a more perplexing issue in light of the Supreme Court disposition.

At the outset, it is to be noted that, whatever else may have been the intent and purpose of the Supreme Court in vacating our judgment and remanding the cause to this court for further proceedings, as distinguished from simply dismissing the appeal on grounds of mootness, the Supreme Court's order had the distinct effect of allowing, without question, the plaintiff to remain in and graduate from law school. Such may have well been an underlying consideration for the action taken by the majority view, particularly in light of the fears expressed in the dissenting opinion per Mr. Justice Brennan.

Be that as it may, however, it would appear as a general proposition that when an appellate court determines that, because of mootness it lacks constitutional authority to rule upon a case, it no longer possesses jurisdiction to function upon the subject matter or litigants involved in that cause of action. Logically, then, it would appear more appropriate for an appellate court in that position to simply dismiss the appeal.

Nevertheless, it appears to be well recognized that the Supreme Court does indeed exercise the authority to vacate and remand moot causes for further proceedings. *See* R. Stern & E. Gressman, *Supreme Court Practice* § 18.3 (4th ed. 1969); R. Robertson & F. Kirkham, *Jurisdiction of the Supreme Court of the United States* § 273 (2d ed. R. Wolfson & P. Kurland 1951). Numerous cases passed upon by the Supreme Court appear to indicate that this type of disposition is a relatively standard procedure. *See, e.g., Garvin v. Cochran,* 371 U.S. 27, 9 L. Ed. 2d 4, 83 S. Ct. 122 (1962); *Oil Workers Local 8-6 v. Missouri,* 361 U.S. 363, 4

L. Ed. 2d 373, 80 S. Ct. 391 (1960); *Riley v. Teamsters Local 633*, 336 U.S. 930, 93 L. Ed. 1091, 69 S. Ct. 737 (1949); *Schenley Distilling Corp. v. Anderson*, 333 U.S. 878, 92 L. Ed. 1154, 68 S. Ct. 914 (1948); *Dyer v. City Council*, 333 U.S. 825, 92 L. Ed. 1111, 68 S. Ct. 450 (1948); *Natural Milk Producers Ass'n v. San Francisco*, 317 U.S. 423, 87 L. Ed. 375, 63 S. Ct. 359 (1943); *Washington ex rel. Columbia Broadcasting Co. v. Superior Court*, 310 U.S. 613, 84 L. Ed. 1389, 60 S. Ct. 1085 (1940); *Florida ex rel. Hardware Mut. Cas. Co. v. Knott*, 308 U.S. 507, 84 L. Ed. 434, 60 S. Ct. 72 (1939). *See generally* Diamond, *Federal Jurisdiction to Decide Moot Cases*, 94 U. Pa. L. Rev. 125 (1946); Note, *Mootness on Appeal in the Supreme Court*, 83 Harv. L. Rev. 1672 (1970); Note, *Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U. Pa. L. Rev. 772 (1955).

Utilization by the Supreme Court on this issue of mootness procedure has had a rather interesting development. As a general matter, the constitutional power of a court to decide a contention presented on appeal does not define a constitutional duty. There is latitude in appellate courts to develop doctrines of judicial administration that permit a court to decline decision though not preclude it by a jurisdictional bar from consideration of the matter. *See, e.g., Benton v. Maryland*, 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969); *Alton & S. Ry. v. International Ass'n of Machinists*, 463 F.2d 872 (D.C. Cir. 1972). When dealing with the lower federal courts, then, the Supreme Court has exercised its discretionary appellate supervisory power to reverse and remand decisions that are moot, rather than simply dismissing the appeals, upon two primary theories: (1) whenever in its opinion justice requires it, the court has asserted that it has the authority to deal with the rights of the parties as they stood at the commencement of the suit; see *South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*, 145 U.S. 300, 36 L. Ed. 712, 12 S. Ct. 921 (1892); *Mills v. Green*, 159 U.S. 651, 40 L. Ed. 293, 16 S. Ct. 132 (1895); *United States v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft*, 239 U.S. 466, 60 L. Ed.

387, 36 S. Ct. 212 (1916); *Berry v. Davis,* 242 U.S. 468, 61 L. Ed. 441, 37 S. Ct. 208 (1917); *Board of Pub. Util. Comm'rs v. Compania General de Tabacos de Filipinas,* 249 U.S. 425, 63 L. Ed. 687, 39 S. Ct. 332 (1919); *Commercial Cable Co. v. Burleson,* 250 U.S. 360, 63 L. Ed. 1030, 39 S. Ct. 512 (1919); *Heitmuller v. Stokes,* 256 U.S. 359, 65 L. Ed. 990, 41 S. Ct. 522 (1921); and, (2) whenever mere dismissal of the appeal would leave a lower appellate determination still in force, notwithstanding the basis therefor has disappeared, the court will dispose of the "whole case," not merely the appellate proceeding which brought the case to the court. *See United States v. The Peggy,* 5 U.S. (1 Cranch) 103 (1801); *Brownlow v. Schwartz,* 261 U.S. 216, 67 L. Ed. 620, 43 S. Ct. 263 (1923); *Walling v. James V. Reuter, Inc.,* 321 U.S. 671, 88 L. Ed. 1001, 64 S. Ct. 826 (1944).

Our research has indicated that the application of these federal vacation and remand theories was initially applied to moot cases arising from state appellate courts in the case of *Allen & Reed, Inc. v. Presbrey,* 280 U.S. 518, 74 L. Ed. 588, 50 S. Ct. 66 (1929), despite the court's earlier practice of simply dismissing the appeal from the state appellate court's decision. *Codlin v. Kohlhausen,* 181 U.S. 151, 45 L. Ed. 793, 21 S. Ct. 584 (1901); *American Book Co. v. Kansas ex rel. Nichols,* 193 U.S. 49, 48 L. Ed. 613, 24 S. Ct. 394 (1904). As a matter of practice, application of this procedure to moot cases from state appellate courts has become a relatively standard disposition by the Supreme Court, although the reasons or rationale for doing so have never been fully explained.[2]

Regardless of the reasons for its action, the fact remains

---

[2]Aside from the equitable theories advanced in support of the practice, the Supreme Court may consider 28 U.S.C. § 2106 affords statutory authority for such action. It provides:

> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

that the Supreme Court has remanded the cause to this court for such further proceedings as we deem appropriate. We turn then for some guidance to the actions of other state appellate courts subsequent to the vacation and remand of a moot case by the Supreme Court. In this vein, we note that it is not unusual for those courts to treat the case similarly to that of their initial consideration, and to reaffirm their prior opinion. *See, e.g., Garvin v. Cochran,* 135 So. 2d 746 (Fla. 1961) (writ of habeas corpus denied without opinion), 371 U.S. 27, 9 L. Ed. 2d 4, 83 S. Ct. 123 (1962) (moot—vacated and remanded), 138 So. 2d 337 (Fla. 1962) (habeas corpus denied without opinion); *Natural Milk Producers Ass'n v. San Francisco,* 20 Cal. 2d 101, 124 P.2d 25 (1942) (aff'd), 317 U.S. 423, 87 L. Ed. 375, 63 S. Ct. 359 (1943) (moot—vacated and remanded), 24 Cal. 2d 122, 148 P.2d 377 (1944) (because plaintiffs advanced the same arguments as previously, the court affirmed the views expressed in its previous opinion); *State ex rel. Columbia Broadcasting Co. v. Superior Court,* 1 Wn.2d 379, 96 P.2d 248 (1939) (writ of appeal denied), 310 U.S. 613, 84 L. Ed. 1389, 60 S. Ct. 1085 (1940) (moot—vacated and remanded), 5 Wn.2d 711, 105 P.2d 70 (1940) (motion to vacate judgment granted, but motion to withdraw opinion denied). *See also* Comment, *Disposition of Moot Cases by the United States Supreme Court,* 23 U. Chi. L. Rev. 77, 93 (1955). We also recognize the doctrine developed by some state appellate courts that stands as an exception to the rule of dismissal of appeals in cases that have become moot. Simply stated, the doctrine permits the state appellate court to continue an appeal in existence, notwithstanding mootness of the controversy, when the court discerns a likelihood of recurrence of the same issue, generally in the framework of a "continuing" or "recurring" controversy, and "public interest" in the controversy. *See, e.g., Huffman v. Alexander,* 197 Ore. 283, 251 P.2d 87, 253 P.2d 289 (1953); *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 104 N.E.2d 769, 30 A.L.R.2d 1132 (1952); *Pallas v. Johnson,* 100 Colo. 449, 68

P.2d 559, 110 A.L.R. 1403 (1937); Annot., *Public interest as ground for refusal to dismiss an appeal, where question has become moot, or dismissal is sought by one or both parties,* 132 A.L.R. 1185 (1941).

We have quite consistently held that the fact that an issue is moot does not divest this court of jurisdiction to decide it. We will retain an appeal and decide issues, even though moot, if they present matters of substantial public interest, particularly where final determination of the issue is essential in guiding the conduct of public officials. *Deaconess Hosp. v. State Highway Comm'n,* 66 Wn.2d 378, 403 P.2d 54 (1965); *National Elec. Contractor's Ass'n v. Seattle School Dist. 1,* 66 Wn.2d 14, 400 P.2d 778 (1965); *State ex rel. Yakima Amusement Co. v. Yakima County,* 192 Wash. 179, 73 P.2d 759 (1937). *See also Grays Harbor Paper Co. v. Grays Harbor County,* 74 Wn.2d 70, 442 P.2d 967 (1968).

Inasmuch as the major question presented herein is whether the law school may, in consonance with the equal protection provisions of our state and federal constitutions, consider the racial or ethnic backgrounds of applicants as one factor in the selection of students, we consider this case to fall within that category of moot cases presenting a substantial issue of broad public import. For this court not to give a determinative ruling on this question would breach our obligation to the public and our duty to the public officials involved in our system of higher education. Having fully considered the contentions of the parties when the cause was initially before us and, being of the same mind, we accordingly reinstate and reaffirm our decision and judgment in this case. *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973).

Noting that the Supreme Court itself recognized that "as a matter of Washington state law it appears that this case would be saved from mootness," due to the public interest, *DeFunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 169, 94 S. Ct. 1704 (1974), and that "there is no reason to suppose that a subsequent case attacking those procedures [minority admissions policy] will not come with relative speed to this

Court, now that the Supreme Court of Washington has spoken," *DeFunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 170, 94 S. Ct. 1704 (1974), we deem that our conclusion comports with and lies within the parameters of the Supreme Court's mandate.

Defendants' motion to reinstate the original judgment of this court in this cause is therefore granted.

STAFFORD and UTTER, JJ., and TUTTLE, J. Pro Tem., concur.

FINLEY, J. (concurring in part; dissenting in part)—On April 23, 1974, the United States Supreme Court ruled per curiam that our decision in *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973), had become moot and thus could not be reviewed on the merits. The Supreme Court then by an order vacated our judgment and remanded the cause for "such proceedings as . . . may be deemed *appropriate.*" (Italics mine.) *DeFunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 170-71, 94 S. Ct. 1704, 1707 (1974).

Notwithstanding the apparently entrenched practice of the Supreme Court of vacating state court judgments that become moot on appeal or certiorari, I have reservations as to the jurisdiction of that court to do so. Although mootness was originally a product of common-law jurisprudence, it is now axiomatic that the federal mootness doctrine is of constitutional dimension and derives from the case or controversy requirement of article 3 of the United States Constitution. When litigation becomes moot, the case or controversy ceases to exist as to the Supreme Court and accordingly that court loses jurisdiction over the matter. *See North Carolina v. Rice,* 404 U.S. 244, 30 L. Ed. 2d 413, 92 S. Ct. 402 (1971); *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3, 11 L. Ed. 2d 347, 84 S. Ct. 391 (1963). *See also* Diamond, *Federal Jurisdiction to Decide Moot Cases,* 94 U. Pa. L. Rev. 125 (1946); Note, *Cases Moot on Appeal: A Limit on the Judicial Power,* 103 U. Pa. L. Rev. 772 (1955). Consequently, the notion that the Supreme Court can vacate a

state court judgment, thereby affecting the legal relations between the parties, *after* the court has determined the case to be moot seems to me rather dubious to say the least.[3] Neither the cases nor the literature has articulated a sound jurisdictional base for the assertion of the power to vacate state court judgments. *See, e.g.,* R. Stern & E. Gressman, *Supreme Court Practice* § 18.3 (4th ed. 1969); R. Robertson & F. Kirkham, *Jurisdiction of the Supreme Court of the United States* § 273 (2d ed. 1951); Diamond, *Federal Jurisdiction to Decide Moot Cases,* 94 U. Pa. L. Rev. 125 (1946); Comment, *Disposition of Moot Cases by the United States Supreme Court,* 23 U. Chi. L. Rev. 77 (1955); Note, *Mootness on Appeal in the Supreme Court,* 83 Harv. L. Rev. 1672 (1970); Note, *Cases Moot on Appeal: A Limit on the Judicial Power,* 103 U. Pa. L. Rev. 772 (1955).

Nevertheless, ever since *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L. Ed. 97 (1816), it has been established that the United States Supreme Court is the final arbiter of the Constitution. *See also Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L. Ed. 257 (1821); *Ableman v. Booth,* 62 U.S. (21 How.) 506, 16 L. Ed. 169 (1859). Accordingly, we must respect and abide by the mandates of the Supreme Court.

In accordance with the court's mandate in the instant case the issue now before this court is what action, if any, is *now appropriate.* Two motions, one by each adversary litigant, have been presented for our consideration. The plaintiffs below have moved to make the matter a class action (for the benefit of all persons similarly situated to the position of plaintiff-respondent Marco DeFunis) to re-

---

[3]*Cf. State ex rel. Columbia Broadcasting Co. v. Superior Court,* 1 Wn.2d 379, 96 P.2d 248 (1939), 310 U.S. 613, 84 L. Ed. 1389, 60 S. Ct. 1085 (1940), 5 Wn.2d 711, 105 P.2d 70 (1940), where the Supreme Court vacated the Washington Supreme Court judgment which became moot pending appeal, but on remand this court also vacated its own judgment. Although the precise issue was not discussed, this court implicitly questioned the validity of the vacation by the Supreme Court. Otherwise, the second vacation by this court would be superfluous.

hear the case and to affirm the judgment of the trial court. I concur with the majority that no proper basis exists upon which to now convert this matter to a class action.

The motion of the defendants below is that this court should reinstate its original judgment, or alternatively, remand the cause to superior court with directions to dismiss the cause as now being moot. The majority opinion concludes that we should reinstate our judgment in *DeFunis, supra.* I dissent.

For the most part, the tenor of the majority opinion is cast in terms of *power,* and with the conclusion of the majority that this court possesses the *power* to reinstate, I agree. However, under the clear mandate from the Supreme Court, our duty is to focus upon the *appropriateness* of such action.

Manifestly, reinstatement of *DeFunis* will ensure that if future litigation ensues challenging the minority admissions program at the University of Washington School of Law, a superior court would be compelled to grant a summary judgment in favor of the University pursuant to CR 56 or to dismiss the cause of action pursuant to CR 12(b)(6) for failure to state a claim upon which relief can be granted. The substantial federal question involved presumably would thus be channeled to the United States Supreme Court on a bare complaint, unaccompanied by a fully particularized set of facts. Reinstatement by this court would thus operate to deprive the Supreme Court of the factual basis so often necessary to cogently frame the issues and upon which to predicate a well-reasoned and well-articulated opinion. For reasons to be hereinafter developed, I do not believe it appropriate for this court to create such an unnecessary and undesirable hiatus in our federal system.

At the core of the existing theory of federalism is the proposition that state court decisions passing on federal constitutional issues are susceptible to judicial review by the Supreme Court. Moreover, the Founding Fathers contemplated that the state courts in a sense would be essentially quasi auxiliaries of the Court of Last Resort—Su-

preme Court—when they rule on issues of constitutional import. *See* The Federalist No. 82 (A. Hamilton). Therefore, one of our obligations in a federal system is to refrain from actions not commensurate or consistent with the doctrine of judicial review by the Supreme Court. Since reinstatement would impinge upon the viability and efficacy of that review, I do not believe that we would fulfill our obligations to the federal aspects of our dual court system by reinstating our *DeFunis* decision.

Of course, this court does have other obligations beyond those to federalism. One such duty, correctly identified by the majority, is to articulate and provide definitive rulings on issues of broad public concern. Indeed, the sole justification offered by the majority in support of reinstatement is the argument that we would abdicate our obligation to the public not to now render a definitive ruling in this protracted litigation. Perhaps this obligation may seem inconsistent with our obligation to the federalist system, but I consider these seemingly divergent obligations and values reconcilable, or at least resolvable. It appears to me that when this court initially ruled in *DeFunis, supra,* it then completely fulfilled its duty to the public. *Now,* as I see it, we are at a chronologically different and analytically distinct stage of the litigation process in which considerations of federalism assume paramount significance and displace considerations of ruling on matters of public interest. Accordingly, in this case we should refrain from reinstating our original judgment absent a stronger countervailing consideration than informing the public generally.

Of course, aberrational cases may arise in the future in which it may be proper for a state court to reinstate or reverse its prior judgment. However, the predicate for reinstatement should not be simply to solve an issue of public interest. Rather, the pivotal consideration usually will be whether res judicata or collateral estoppel effect should be given to the state supreme court judgment. Apparently, the underlying motivation behind the trend of the Supreme

Court to vacate moot appeals is to afford it and state courts some flexibility in determining whether justice as between the parties would best be served by giving or denying res judicata effect to a prior state judgment. *See* Comment, *Disposition of Moot Cases by the United States Supreme Court*, 23 U. Chi. L. Rev. 77, 82-83, 93 (1955). Consequently, reinstatement or reversal would arguably be proper when the one or the other is necessary to insure justice to the litigants before the court.

For instance, in *Dyer v. City Council*, 250 Wis. 613, 27 N.W.2d 733 (1947), 333 U.S. 825, 92 L. Ed. 1111, 68 S. Ct. 450 (1948), 252 Wis. 249, 32 N.W.2d 333 (1948), the Wisconsin Supreme Court denied the appellant a license to sell milk. The case was rendered moot when the appellant was granted a license pending appeal. After vacation and remand by the Supreme Court, the Wisconsin court then reversed its prior decision—apparently to ensure that the license granted to the appellant could not be withdrawn on the basis of the original Wisconsin judgment. *See* Comment, *Disposition of Moot Cases by the United States Supreme Court*, 23 U. Chi. L. Rev. 77, 87 (1955). Arguably, such a situation provides a sound basis for a state court to render a judgment notwithstanding a prior vacation by the Supreme Court since the interests of federalism should yield when necessary to prevent gross injustice.

However, under the particular facts of the instant case, I can see no injustice to the University of Washington that would be engendered by our refusal to reinstate our prior judgment and make this matter res judicata as between it and Marco DeFunis. In its brief, the University urges that it will suffer injustice because its minority admissions program will no longer have the sanction of our prior decision. But, of course, this is not a res judicata consideration but merely a stare decisis consideration which I have previously concluded is subordinate to the interest subsequently of ensuring review by the Supreme Court on a complete set of facts. Therefore, I conclude that the *De-*

634

*Funis* litigation in its entirety should simply be rendered null and void.

As the state of affairs now exist, little action is required on our part to accomplish this end. Conceptually, the judgment of the trial court became a nullity—"mere wastepaper"—the moment we reversed it in our *DeFunis* ruling. 2 Freeman, *Law of Judgments* 2416 (5th ed. 1925). The proceedings were then placed in the posture that they occupied prior to the rendition of the trial court judgment. *Markel v. Transamerica Title Ins. Co.,* 103 Ariz. 353, 442 P.2d 97 (1968); *Doughty v. State Dep't of Pub. Welfare,* 233 Ind. 475, 121 N.E.2d 645 (1954); *Phebus v. Dunford,* 114 Utah 292, 198 P.2d 973 (1948).

The vacation of our judgment by the Supreme Court effected no change in that posture. While a trial court judgment, reversed by an intermediate court, may be revived by a subsequent reversal (*i.e.*, a ruling on the merits), by a higher appellate court, *Clough v. Greyhound Corp.,* 92 Ga. App. 558, 88 S.E.2d 700 (1955); *Coit v. Sistare,* 85 Conn. 573, 84 A. 119 (1912), the same effect cannot logically be accorded to a mere *vacation* which is essentially a neutral disposition. If a vacation effected a revival, then the Supreme Court would have made a de facto, albeit sub silencio, ruling on the merits. Since the court expressly disclaimed the power to rule on the substantive issues, it necessarily follows that the vacation should not result in a revival. Rather, the vacation simply nullified our state Supreme Court judgment and everything incorporated in it— including the trial court judgment.

Conceptually, then, we are left with no *judgment*, either of the trial court or of our state Supreme Court to vacate or with which to be concerned, although technically the *proceedings* in the trial court prior to its judgment are still in existence. Therefore, I would simply remand to the trial court with directions to dismiss the complaint.

WRIGHT and BRACHTENBACH, JJ., concur with FINLEY, J.

BRACHTENBACH, J. (concurring in part; dissenting in part)—By concurring in the opinion by Justice Finley I do not intend to express any opinion as to the merits of the case. I did not participate in the original decision as I was not then a member of the court. My function is thus limited to joining with Justice Hamilton in holding that this matter, at this stage, is not convertible to a class action and agreeing with Justice Finley's dissent as to reinstatement of the original opinion. I view neither action as reaching the merits.

HALE, C.J. (dissenting)—I would grant the motion to declare this to be a class action and to reinstate the judgment of the Superior Court.

In essence, the case now is and by its very nature always has been a class action, culminating in a judgment of this court which operates both in favor of and against identifiable classes of individuals who have been admitted to or who have sought or now are seeking but have been refused admission to the University of Washington Law School. It is a judgment directly in favor of those minority students coming within the classes described as Blacks, Chicanos, Indians (North and South American), and Filipinos; it runs directly against those students coming within the classes described as Japanese, Chinese, Whites and all other national and racial groups of Oriental derivations such as Indo-Chinese, Malaysian and others who would seek admission under the law school's minority preferential admission policy.

The common question indigenous to class actions continues to predominate in this case, and the cause inherently meets the basic ingredients of a class action because persisting " 'questions of law or fact common to members of the class predominate over any questions affecting only individual members.' " 3B J. Moore, *Federal Practice* ¶ 23.45 (2) (2d ed. 1974). It is thus by its very nature a class action, and should be adjudged to be one. If this court declares the obvious and attaches the appropriate label describing this to be a class action, much good will be readily accom-

plished and much waste of time, money and talent averted. When this court grants the motion to declare this to be a class action, the case presumably will return to the Supreme Court of the United States for a definitive ruling on the issues—issues so sharply raised, profoundly briefed, vigorously argued and dearly waged.

The Supreme Court of the United States circumspectly granted certiorari, *DeFunis v. Odegaard*, 414 U.S. 1038, 38 L. Ed. 2d 329, 94 S. Ct. 538 (1973); it has never said its order for certiorari was mistakenly or improvidently granted. That court, in a divided opinion, remanded the case as moot, 416 U.S. 312, 40 L. Ed. 2d 164, 94 S. Ct. 1704 (1974), and amended its remand subsequently, 418 U.S. 903, 41 L. Ed. 2d 1151, 94 S. Ct. 3193 (1974). If the case is regarded as a class action, it is not and never has been moot. I think it incumbent upon this court to take every reasonable step available to avoid the waste of time, talent and money engendered by the present impasse; the simple judicial expedient of granting the motion should send the case swiftly on its way back to the Supreme Court of the United States for a definitive ruling.

This is a class action because it precisely meets the definition of a class action and on its face fulfills all of the requirements of a class action as defined in CR 23 (a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

and because, as indicated, the opinion of this court operates as a class action judgment.

If this court assumes that the case was not a class action at the outset for want of a phrase in the complaint asserting it to be one, or is not inherently a class action, then it nevertheless may grant the motion and find it to be a class

action before final determination. As 3B J. Moore, *Federal Practice* ¶ 23.02-2 (2d ed. 1974) states:

> Just as a suit commenced as a class action may be stripped of its class features, an action or actions commenced as non-class in character may, in an appropriate case, be transformed into a class action.[37]
>
> [37]Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc. (ND Ill 1968) 285 F Supp 714, 11 FR Serv2d 23b.1, Case 1 (¶23.35[1], [2] . . .

and adds:

> And, we believe, that the court has the power . . . to order that this be done.[38]
>
> [38]See Richmond v. Irons, *supra* [121 U.S. 27, 51, 30 L. Ed. 864, 7 S. Ct. 788 (1887)] n 37.

The court now denies the motion to declare this to be a class action, partly because the plaintiff advisedly did not intend to foster a competition with other members of the class who might seek admission to and obtain the very seat he was seeking in the law school. Such a contention overlooks the obvious fact that Marco DeFunis took that very risk in bringing this suit. One of the defenses raised against DeFunis' claim and rejected by the trial court was that, while he might conceivably prevail in having the governmental policies of admission to the law school declared unconstitutional, that ruling would not necessarily engender his own admission because other excluded students had higher admission credentials than he. DeFunis knowingly invited and ever since has assumed that hazard in initiating and trying his cause. His action necessarily included a demand for admission in conjunction with all others similarly circumstanced in addition to his challenge to the constitutionality of the law school admission policies.

Thus, the suit was maintained against the university and the law school for a decree wedging DeFunis into the entering class as but one of the many who had similarly sought admission, and to do so he necessarily had to lay his credentials alongside those of all others. But that was not the sole issue; he also maintained his suit to compel the

abrogation of claimed unfair, unconstitutional and discriminatory admission policies and to compel the institution of an assertedly fair, nondiscriminatory and lawful admission policy. The court's assessment of the true nature of the suit is, therefore, in error.

If the case has been mooted by DeFunis' graduation, why, having been qualified to take the bar examination—or possibly having passed it—would he be here now continuing to pursue his remedy? Obviously, the real remedy is sought on behalf of a class, i.e., those students denied admission while others of lesser academic qualifications were given preference because of race and national origin, all of whom belonged to that class of law school applicants who sought admission during a relevant period prior to and after De-Funis was admitted. DeFunis' admission, it must be remembered, was not based on his acceptance as a student by the law school hierarchy, nor on a change in admission policies to accommodate him, but solely by virtue of the decree of a court of competent jurisdiction.

The conclusion that Mr. DeFunis sought to avoid competing for admission among those who, although similarly rejected, had higher qualifications than he, is bound to be error and does not support the court's rationale, for that is the very kind of competition which inheres in many class actions among the members of the class—reducing the individual recoveries by increasing the numbers who qualify for them. Mr. DeFunis, therefore, wages his suit on behalf of himself and on behalf of those rejected students who, according to their view of the matter, would have the court direct a law school admission policy conforming to the Fourteenth Amendment and to this state's Const. art, 1, § 12, establishing equal protection of the laws, and to compel, according to their view, compliance with the statutes of this state creating, operating and regulating the university.

There is more to this case than the admission policies of a publicly-owned, -operated and -supported university. The court's opinion sets a precedent affecting the administration

of State agencies, institutions, boards, commissions, munici-pal corporations and executive departments, and will impinge necessarily upon all of the officers charged by law with operating and administering any of them. Thus, the court's opinion, standing alone, establishes a precedent not only for the operation of the university but inevitably establishes principles applicable to all governmental agencies and institutions of the state which may contemplate adopting selective or preferential policies based on race, ancestry, national origin, or national derivation.

A decision of this court upholding as constitutional policies of preferment and selection based on race, national origin or derivation or ancestry in a state university must be given substantial application to all other institutions and agencies of the state. Unless the case is decided on its merits, the court's opinion must be given precedential effect in all spheres of governmental activity.

When the Supreme Court of the United States, after assuming jurisdiction and hearing argument mooted the whole thing, it created boundless ramifications which can now be resolved one way or the other only by returning the case to that court. Questions pertaining to the equal protection of the laws and the special immunities and privileges provisions of the Fourteenth Amendment and the equal application of the laws provision of the State constitution, article 1, section 12, arising from the operation of the state, its subdivisions, institutions and agencies, when brought before the courts, must be now resolved in accordance with the precedent set by this opinion. Either the State government and its subordinate agencies, under the constitution, may now operate by giving preference on the basis of national origin or derivation, or race, or the court's opinion will have to be overruled. By reason of our declaring this to be a class action, the Supreme Court of the United States will presumably supply us with an answer.

DeFunis' case never was mooted under the laws of the State of Washington. Twice he was rejected for admission

to the law school; twice he was refused permission to·attend classes. He was never accepted as a regularly enrolled student but allowed to attend classes and accumulate credits only by virtue of the decree of the Superior Court—a constitutional court of general and unlimited jurisdiction which, so to speak, applied the leverage of the constitutions as that court understood them, to compel the law school to provide a seat for DeFunis. When this court entered its judgment of reversal on March 8, 1973 (*DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973)), DeFunis had neither been graduated nor was he then assured of graduation. Nor, on April 23, 1974, when the Supreme Court of the United States declared this case moot and *vacated* the judgment of this court had DeFunis graduated or been certain to do so. *DeFunis v. Odegaard,* 416 U.S. 312, 40 L. Ed. 2d 164, 94 S. Ct. 1704 (1974).

Mootness in this case can readily be tested by analogy to the civil rights statutes. In considering the proposition of mootness, both the Supreme Court of the United States, in its mandate of June 24, 1974, vacating the judgment of this court and the opinion of this court in the instant case apparently ignored a salient civil rights statute securing to DeFunis an apparent remedy in both state and federal courts:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1970).

Can it be sensibly argued that any rights which DeFunis may claim under this act were mooted by his graduation?

Assuming arguendo that, because of overcrowding and to effect an affirmative action program giving members of minorities preference, DeFunis had been refused a civil

service job; or his right to attend a public high school; or to operate a motor vehicle upon the public highway; or even to teach in the public schools; or to do any of a number of other things requiring a certificate, license, permit or franchise issued by public authority, would his case in such instances be mooted merely by a decree wedging him into the sought position until the heat generated by his case had cooled? If such be the rule, then one loses all capability for enforcing his constitutional rights as a matter of principle and his success in attaining them in lite pendente transitu, so to speak, will be a temporary relief based on expediency and not on law.

One seeking to enforce a constitutional right against the government will under this court's denial of the instant motion always be threatened with the defense of mootness. After years of litigation, the final adjudication in the courts may readily be mooted by the simple expedient undertaken by the involved governmental unit—even during appeal—to unilaterally grant the privilege, certificate, franchise, license, or right demanded, and thus avoid a judicial resolution of the plaintiff's claims and those of all similarly situated.

Because DeFunis entered the law school by virtue of a decree of the Superior Court commanding his admission, and was continuing as a student under that decree, along with a stay of the judgment of this court reversing that decree entered by the Supreme Court of the United States pending review and disposition, we should, therefore, as I understand it, adhere to the principle that the case is not moot if the problem involved is "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 55 L. Ed. 310, 31 S. Ct. 279 (1911). Thus, the case is not and never has been moot under the law of this jurisdiction and DeFunis' ultimate graduation did not resolve an issue capable of repetition, yet evading review.

As earlier noted, at the time the Supreme Court of the United States remanded this case to this court on April 23,

1974, DeFunis was continuing his studies as a member of the third-year class under the protection of a decree of the Superior Court which had ordered his admission to the law school. He had not been graduated and was not eligible to take the bar examination. His records at the time, at best, showed him to be enrolled because of the command of a court of competent jurisdiction, and at worst, at the sufferance of the law school administration. He was in school not because the law school admitted him as a qualified student but because a court had ordered his admission.

DeFunis' position was quite similar to that of plaintiffs Shasta Hatter and Julie Johnston in *Hatter v. Los Angeles City High School Dist.*, 452 F.2d 673 (9th Cir. 1971), who had been reprimanded and threatened with expulsion from Venice High School in Los Angeles for distributing leaflets and otherwise urging the students to boycott the school's chocolate drive. Plaintiffs there had brought suit alleging infringement of freedom of speech and sought an injunction expunging the records of the disciplinary action. Defendant school district claimed mootness because neither plaintiff was a student at the time of the review, and the dress code which plaintiffs had protested had been repealed.

Despite the fact that neither party was a student at Venice High School at the time of the appeal and the dress code had been repealed, the Court of Appeals reversed the District Court on the question of mootness, saying, at page 674:

> However, so long as disciplinary measures taken against Hatter and Johnston remain unexpunged from school records they threaten prejudice with respect to college admission and future employment.

Another case, however, and one perhaps even more persuasive in the instant case on the issue of mootness is *Moore v. Ogilvie*, 394 U.S. 814, 23 L. Ed. 2d 1, 89 S. Ct. 1493 (1969), an election controversy which arose prior to an election but was heard and decided on appeal after the election despite a motion to dismiss for mootness.

. In *Moore,* defendants were members of the Illinois Electoral Board with whom the appellants had filed nominating petitions containing the names of 26,500 qualified voters supporting appellants' nomination. The electoral board ruled that appellees could not be certified to the county clerk for the November 1968 election because of a proviso in an Illinois statute requiring that at least 25,000 electors sign the nominating petition which must include " 'the signatures of 200 qualified voters from each of at least 50 counties.' " On October 8, 1968, appellants moved in the Supreme Court that hearing and disposition be advanced and expedited because of the shortness of time remaining, and on October 14, 1968, the motion to advance and expedite was denied. More than 4 months after the November 1968 election upon which a claim of mootness had been made, the court rejected the claim of mootness and decided the case on the merits, saying:

> Appellees urged in a motion to dismiss that since the November 5, 1968, election has been held, there is no possibility of granting any relief to appellants and that the appeal should be dismissed. But, while the 1968 election is over, the burden which *MacDougall v. Green, supra* [335 U.S. 281, 93 L. Ed. 3, 69 S. Ct. 1 (1948)], allowed to be placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935. The problem is therefore "capable of repetition, yet evading review," *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515 [55 L. Ed. 310, 31 S. Ct. 279 (1911)]. The need for its resolution thus reflects a continuing controversy in the federal-state area where our "one man, one vote" decisions have thrust. We turn then to the merits.

*Moore v. Ogilvie, supra* at 816.

There are, in DeFunis, issues of national import which ought to be resolved by the highest court in the land. These issues extend far beyond the immediate problem of admission to state-supported colleges and universities, law schools, medical schools, nursing schools and all other schools offering specialized training in the arts, sciences

and professions upon a limited and selective basis. They are issues running to the very center of all operations of state government whose subordinate agencies have the power to grant or deny a privilege, or exercise a power, or whose actions may abridge the exercise of a constitutional right.

In the instant case, the University of Washington and its law school is the only tax-supported institution of higher learning in this state offering complete professional training in the law; it is a wholly-owned and operated agency of the State of Washington charged with carrying out that purpose. I think it must be held to the same standards of fairness and equality as any other agency of the State having the powers and duty to grant valuable privileges or to uphold constitutional rights. The issues so vigorously argued here persist and will continue to persist despite DeFunis' graduation from the law school or his admission to the bar. He has a right to know whether, in pursuing his studies and his rights simultaneously, he jeopardized loss of one at the attainment of the other, or whether abandonment of the one assured in law achievement of the other. His claim was not peculiar only to himself, but rather one common to all other student applicants similarly entitled to a definite decision on the merits of his and their denial of admission under then applied governmental policies. He and all others so situated had a right to know whether and to what extent and for whatever purposes the government, its agencies and institutions may use race, national origin, nationality or religion as a basis for selection or preference.

All that needs be done to definitively resolve this issue is for this court to declare the obvious and grant DeFunis' motion to declare this to be a class action. That I would do.

HUNTER, J., concurs with HALE, C.J.