65 P.3d 1 (2003)
116 Wash.App. 9
George SCHWENDEMAN, on behalf of himself and all others similarly situated, Appellant,
v.
USAA CASUALTY INSURANCE COMPANY, Respondent.
No. 49932-7-I.
Court of Appeals of Washington, Division 1.
January 13, 2003.
Publication Ordered March 13, 2003.
*2 Steve Berman, Sean Matt, Erin Flory, Hagens Berman, Seattle, WA, for Appellant.
Kelly Corr, Michael Moore, Corr Cronin LLP, Seattle, WA, for Respondent.
SCHINDLER, J.
George Schwendeman seeks certification of a class of insureds of USAA Casualty Insurance Company (USAA) who have had their damaged vehicles repaired with fenders, bumpers, and other parts not made by the original equipment manufacturer (OEM). He claims that the use of non-OEM parts violates the terms of USAA's insurance policy and the Consumer Protection Act[1] and that non-OEM parts are inferior in appearance, performance, and safety to OEM parts. The trial court denied Schwendeman's motion for class certification and dismissed the class claims. We affirm.

FACTS
Schwendeman is insured by a vehicle casualty insurance policy issued by USAA.[2] When his truck was damaged in an automobile accident, USAA referred him to a body shop to have it repaired. The body shop replaced the damaged rear bumper on Schwendeman's truck with a non-OEM rear bumper.
Under its policy, USAA's liability for the repair of his truck is limited to the:
lesser of the actual cash value of the property or part damaged or stolen, or the amount necessary to repair or replace the property or part.[[3]]
"Actual cash value" is defined in USAA's policy as:
the amount which it would cost to replace the stolen or damaged property with new property of like kind and quality, less allowance for depreciation and physical deterioration permitted by law.[[4]]
Under USAA's Quality Replacement Parts program, its appraisers may designate use of non-OEM replacement parts for repair estimates when the parts are of like kind and quality to the parts they replace. USAA warrants each part used in repair for a period equal to the remainder of the vehicle's applicable warranty or three years from the date of repair, whichever is greater. Washington's Insurance Commissioner has stated that parts of "like kind and quality" *3 need not necessarily be new parts and if the replacement part is guaranteed and is in the same condition, the repair requirements are met.[5]
Schwendeman sued USAA in March 1999, alleging breach of contract, violation of the Consumer Protection Act, and breach of the duty of good faith and fair dealing. He filed a motion for class certification in November 1999, withdrew it, and filed a second motion, together with approximately 1,500 pages of supporting material, in May 2000. Schwendeman defines the proposed class as:
[a]ll residents of the State of Washington who (i) were insured by a vehicle casualty insurance policy issued by defendant USAA; and (ii) made a claim for vehicle repairs pursuant to the policy and had non-OEM "crash" parts installed on their vehicles or else received monetary compensation determined in relation to the cost of non-OEM "crash" parts.[[6]]
The trial court scheduled a hearing on the request for class certification for September 12, 2000. USAA filed a memorandum in opposition to Schwendeman's motion for class certification. In his reply to USAA's opposition, Schwendeman submitted, for the first time, declarations of two experts, Charles Clarke, Ph.D., and Paul Griglio, to show he would use evidence common to all class members to prove that all non-OEM crash parts are inferior to OEM crash parts.
USAA deposed Clarke in Mobile, Alabama, and Griglio in Traverse City, Michigan. On September 8, 2000, just before the September 12 hearing on class certification, USAA moved to strike the declarations of both Clarke and Griglio on the ground that neither had the relevant expertise to render their opinions and their opinions lacked a sufficient factual basis.
At the beginning of the hearing on September 12, 2000, the trial court indicated it would hear argument on the motion for class certification before deciding the motion. The court agreed to proceed with oral argument after discussion with the parties about the motion to strike, without considering the issues raised in the motion to strike, so Schwendeman would have the opportunity to submit a response.[7]
Approximately a month later, on October 20, 2000, the trial court issued its order and denied Schwendeman's motion for class certification. The October 20, 2000 order did not set forth the specific grounds for the denial. On October 20, 2000, the trial court also granted in part USAA's motion to strike the experts' declarations:
The court strikes the opinions that non-OEM parts are all not of "like kind/quality" as OEM parts across the board for the reasons that:
a) "like kind & quality["] does not mean identical in every regard regardless of materiality[,]
b) the foundation for the opinions is insufficient in terms of appropriate expertise and/or factual basis.[[8]]
Approximately four months later, USAA filed a motion for entry of a revised order that specified the grounds upon which the court based its decision to deny class certification. Both USAA and Schwendeman submitted proposed orders. USAA's proposed order set forth numerous grounds for the denial of class certification, namely, that Schwendeman failed to demonstrate that all four requirements of CR 23(a) were met or that the requirement of CR 23(b)(3) was *4 met.[9] Schwendeman opposed USAA's motion because the proposed order included express findings on every CR 23 element. According to Schwendeman, the court denied his motion for class certification "on the single basis that common issues did not predominate over individual issues."[10] Schwendeman's proposed order denied class certification on the ground that, in light of the court's order striking in part the experts' declarations, CR 23(b)(3) was not met because common issues of law and fact did not predominate over questions affecting only individual class members. Schwendeman's proposed order also provided that because class certification was denied on the ground that he failed to meet the requirements of CR 23(b)(3), the court did not decide the remaining requirements of CR 23. The trial court's revised order denying class certification entered on March 9, 2001, rejects Schwendeman's contention.
The court entered a modified version of USAA's proposed order denying class certification. The order denies Schwendeman's motion for class certification on the grounds that he failed to demonstrate under CR 23(a) that there were questions of law or fact common to the class and failed to demonstrate under CR 23(b) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the adjudication of this controversy."[11] Schwendeman sought discretionary review in this court. This court denied his motion.
Schwendeman then settled his individual claims against USAA and entered into a settlement agreement and release. The release provides in part:
In consideration of the promises made herein Plaintiff hereby permanently releases and discharges USAA CIC, including all officers, directors, agents, attorneys, affiliates, subsidiaries, parents, or repair facilities related thereto, from any and all individual claims, demands, damages, and causes of action of whatever kind or nature held or alleged by Plaintiff in this Action, or which could have been alleged by Plaintiff in this action in connection with the repair of his vehicle, whether known or unknown, except that this release does not apply to any claims pending per Schwendeman v. Wilkins, King Count Cause No. 01-2-04799-OSEA. Plaintiff further expressly agrees that the compensation provided by this Agreement constitutes just and complete compensation for the individual claims raised by him in his litigation. Other than the compensation provided for in this Agreement, Plaintiff expressly waives any additional claim for attorneys fees or costs, or for other compensation related to the individual claims alleged by him in the Action.
Schwendeman submitted an agreed CR 54 judgment, which the court entered on January 24, 2002. The judgment dismissed Schwendeman's individual claims with prejudice and the class claims with prejudice.[12] Schwendeman appeals.

DISCUSSION
Mootness
Because Schwendeman agreed to dismiss his claims with USAA, USAA argues that his appeal of the trial court's decision to deny his motion for class certification is moot. We disagree.
Schwendeman's individual claim on the merits is separate from his claim that he is entitled to represent a class.[13] The United *5 States Supreme Court has held that a plaintiff whose individual claim has expired may still appeal the denial of class certification.[14] Finding no difference between the expiration of an individual claim and the settlement of a claim, the Eleventh Circuit held that a plaintiff who settles his or her individual claim may appeal the denial of class certification.[15] Where, however, the plaintiff releases "any and all" claims "of any kind or nature whatsoever that he may have individually," as well as "any and all" monetary claims "including claims for compensation as a member or representative of the putative class," the release extinguishes both the plaintiff's individual interest and his or her interest in having a class certified.[16]
In the settlement agreement and release, Schwendeman released USAA "from any and all individual claims" only, not "any and all" claims. The release makes no mention of the class claims. By the terms of the release, Schwendeman released only his individual claims against USAA. His interest in having a class certified and in representing the class remains. The release did not extinguish Schwendeman's right to appeal the denial of class certification and his appeal is not moot.
Class Certification
A plaintiff seeking class certification must satisfy the requirements of CR 23. CR 23(a) enumerates four prerequisites to a class action:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[[17]]
In addition, one of the three requirements of CR 23(b) must be met.[18]
Although CR 23 should be liberally interpreted in favor of class actions,[19] class actions must strictly conform to the requirements of CR 23.[20] "Class actions are specialized types of suits, and as a general rule must be brought and maintained in strict conformity with the requirements of CR 23."[21] Accordingly, before granting class certification, the trial court must engage in a "rigorous analysis" to ensure that the prerequisites of the rule have been met.[22]
*6 We review a trial court's class certification decision for manifest abuse of discretion.[23] We will uphold the trial court's decision if the record shows that the court considered the criteria for class certification set forth in CR 23 and if the court's decision is based on tenable grounds and is not manifestly unreasonable.[24] The court must articulate on the record each of the CR 23 factors for its decision on the certification issue.[25]
Although the trial court's initial order denying class certification did not identify the CR 23 criteria upon which it based its decision to deny class certification, in its revised order, the court expressly identified the factors upon which it based its decision. The court found Schwendeman failed to establish the commonality, predominance, and superiority requirements for a class action. The order provides:
A. Under CR 23(a), the Plaintiff has failed to demonstrate that:
2. there are questions of law or fact common to the class;
B. Under CR 23(b), the Plaintiff has failed to demonstrate that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the adjudication of this controversy.[[26]]
Commonality and Predominance
Commonality exists when the facts indicate that the defendant was engaged in a "common course of conduct' in relation to all the potential class members."[27] There need be only a single issue common to all members of the class to meet this prerequisite.[28]
The commonality requirement of CR 23(a) is, however, subsumed under the more stringent requirement in CR 23(b)(3).[29] Pursuant to CR 23(b)(3), the plaintiff must demonstrate that common questions of law predominate over questions affecting only individual members and that a class action is the superior method of handling the claim. The commonality requirement of CR 23(a)(2) has sometimes been seen as a superfluous provision because, in order for an action to be maintained under CR 23(b)(3), there must be a finding that common questions predominate over individual issues.[30] The predominance requirement is more exacting and stringent than the commonality requirement. The critical issue before the trial court and on appeal is whether the predominance requirement of CR 23(b)(3) is met.
The relevant inquiry for the predominance requirement is whether the proposed class is sufficiently cohesive to warrant adjudication by class representation.[31] In determining whether this requirement is met, the court engages "in a pragmatic inquiry into whether there is a common nucleus of operative facts to each class member's claim."[32]
*7 According to Schwendeman, the issue common to all class members is whether, by using non-OEM parts, USAA breached its obligation to replace damaged parts with parts of "like kind and quality." He argues that resolution of this issue will involve nothing more than a comparison of a non-OEM part with its OEM counterpart and will not require an examination of each insured's vehicle because, according to his experts, regardless of what part is compared, the non-OEM part will always be inferior in terms of durability, performance, and safety.[33] Thus, he argues, by using non-OEM parts, USAA can never meet its obligation to replace damaged parts with parts of like kind and quality.[34]
USAA contends that because not all insureds' vehicles will involve the same damaged part[35] and because none of the parts will be in the same condition prior to the accident, a comparison of a non-OEM part to its OEM counterpart, in the abstract, cannot resolve the policy's like kind and quality issue. According to USAA, whether it has met the contractual obligation to repair an insured's vehicle with a part of like kind and quality will depend on the condition of each insured's vehicle, particularly the kind and quality of the part being replaced and the replacement part. The trial court agreed with USAA. We conclude the court's decision is based on tenable grounds and is not manifestly unreasonable.
All claims arise out of USAA's insurance policy which, in the event of damage, requires USAA to provide replacement parts of "like kind and quality." Interpretation of that phrase, which is not defined in the policy, is one of the key issues in this case. As previously noted, the Washington Insurance Commissioner, as a matter of public policy, does not interpret "like kind and quality" to mean new parts. Based on its analysis, the trial court also found that "like kind and quality" does not mean "identical in every regard regardless of materiality."[36]
The determination of whether the use of a non-OEM crash part in a particular instance complied with USAA's obligation under its policy and with state law requirements regarding the use of non-OEM crash parts requires individualized proof with respect to *8 each vehicle repaired. USAA is only obligated to pay to replace the damaged part with a like kind and quality part less depreciation and physical deterioration. By the express terms of the USAA insurance contract, whether a replacement part is of "like kind and quality" to the part it replaces necessarily requires ascertaining the condition of the vehicle before the accident in terms of its age, mileage, and physical condition, and the quality of the replacement part. Moreover, the USAA policy's definition of actual cash value takes into account the existing condition of the vehicle at the time of the accident. This too requires an examination of the damaged vehicle and the non-OEM crash part. Given the need to examine the condition of the vehicles and the differences in vehicle makes and models and the fact that there are several manufacturers of non-OEM crash parts, the determination of whether a particular non-OEM crash part is inferior to its OEM counterpart would require testing thousands of crash parts. There is not a common nucleus of operative facts. Rather, the class claims require consideration of so many variables that the questions are more individualized than common to all class members.
Schwendeman argues that Avery v. State Farm Mut. Auto. Ins. Co.,[37] in which State Farm's insureds prevailed in a class action based on State Farm's insurance policy and its practice of using non-OEM parts to repair insureds' damaged vehicles, is dispositive of the class certification issue in this case.[38]
The court in Avery found that State Farm had a mandatory and uniform policy to use non-OEM replacement parts and that all of the non-OEM replacement parts specified by State Farm were inferior to OEM parts in terms of appearance, fit, quality, function, durability, and performance. Because there were common issues relating to the class claims of breach of contract and consumer fraud, the Avery court determined that the existence of individual defenses and the need for individual proof on subsidiary questions would not defeat the predominance of the common questions regarding State Farm's violation of its contracts and state law.[39]
Avery is different from this case in several respects. The insurance policies at issue in the two cases contain different language. In the policy involved in Avery, State Farm guaranteed to use parts of like kind and quality and to restore the insured's vehicle to its preloss condition. USAA's policy does not make this guarantee. USAA's obligation is to replace the stolen or damaged property with new property of like kind and quality, less an allowance for depreciation and physical deterioration. Also, when State Farm implemented its policy mandating the use of non-OEM parts, it denied its claim estimators any discretion to substitute OEM parts for non-OEM parts.[40] Here, the record shows that each of USAA's regional directors has "considerable discretion" about how to implement the non-OEM parts policy and each has the authority to make decisions on the appropriateness of a particular replacement part on a case-by-case basis.[41] Also, *9 notwithstanding the language in its policies, State Farm's practice was such that the plaintiffs in Avery did not have to present individualized proof of preloss condition, and the condition of each individual insured's vehicle was not relevant. "[T]he unequivocal and singular conclusion that could be drawn from the evidence is that when a property damage claim was made, State Farm did not concern itself with trying to duplicate preloss injury or damage."[42] Here, as discussed, the condition of each individual insured's vehicle is relevant. Additionally, there is no suggestion in Avery that State Farm offered a warranty for non-OEM parts, as does USAA, nor is there evidence of a dispute resolution process in State Farm's policies, as there is in USAA's policies. Finally, the Illinois rule relating to class actions requires only that a class action be an "appropriate" rather than Washington's rule that it is a "superior" means of adjudication.[43]Avery is not, as Schwendeman argues, dispositive of the issue of whether the trial court erred by denying class certification.
Schwendeman argues the trial court erred by finding that he failed to establish the commonality and predominance requirements of CR 23(b)(3) because it granted the motion to strike in part his experts' opinions and conclusions. Contrary to Schwendeman's contention, it is evident from the court's order denying class certification that this was not the sole basis for the court's decision to deny his request for class certification. The court denied class certification for several reasons, including Schwendeman's failure to demonstrate that common questions predominate over individual ones (a decision that was not based exclusively on acceptance or rejection of the experts' opinions) and that a class action was the superior means of adjudicating the controversy (a matter to which the experts' declarations had no relevance). Thus, contrary to Schwendeman's argument, if the court erred by striking the declarations, that does not compel a finding that the court abused its discretion by denying class certification.
We agree with Schwendeman that, when deciding whether to certify a class, the trial court should not conduct a preliminary inquiry into the merits by, for example, going beyond determining the admissibility of expert testimony and delving into issues related to the weight of conflicting expert testimony.[44] But, the record does not show that the trial court conducted a preliminary inquiry into the merits or went beyond determining the admissibility of the experts' declarations in ruling on either the motion to certify the class or the motion to strike.
Schwendeman also argues that, in determining the admissibility of the experts' declarations, the trial court applied the wrong standard of admissibility. He argues that the admissibility of expert testimony for the purpose of class certification is governed by a *10 standard that is more liberal than the standard of ER 702 and 703 that is used to determine the admissibility of expert testimony at trial.[45] Under this liberal standard, an expert's declaration is admissible as long as it is not so flawed that it would be inadmissible as a matter of law.[46] The language of the trial court's order striking the declarations does not indicate the standard of admissibility the court used. If, however, the trial court was correct in concluding that "like kind and quality does not mean identical in every regard regardless of materiality" and that the stricken opinions and conclusions lack adequate factual bases and the experts lack adequate expertise, the declarations are inadmissible as a matter of law.
A review of Clarke's and Griglio's declarations shows that the trial court did not commit error in concluding that they lacked adequate factual bases and that the experts lacked adequate expertise. For example, Griglio testified that he has never actually compared a part manufactured by a non-OEM to one made by an OEM. His conclusion that non-OEMs do not use the same materials to manufacture parts as do OEMs is based on an assumption. He has never personally crash-tested a vehicle with OEM parts and is unaware of any crash test in which a non-OEM part affected the crashworthiness of the vehicle. He has never conducted any studies on either the relative quality or the relative safety of OEM and non-OEM parts. Even though he states that non-OEM crash parts are inferior because non-OEMs are unable to reverse-engineer the parts, he testified that he has no experience with reverse engineering and, in fact, never heard of the term until he became involved in the State Farm litigation.
Similarly, Clarke never inspected OEM or non-OEM manufacturing facilities. He knew very little about the company that manufactured the bumper that was installed on Schwendeman's truck, aside from the fact that the company is located in the United States, or about the bumper itself. His durability testing of crash parts was limited to hoods and tailgates, and he never did any crash testing of any parts, nor was he aware of any crash tests in which a non-OEM part adversely affected the crashworthiness of the vehicle. Also, he is not a safety expert.
Even under the liberal standard of admissibility Schwendeman proposes, the trial court did not err by striking in part the experts' declarations. Griglio and Clarke lacked the appropriate expertise to render their opinions and the opinions were not based on an adequate factual basis.
We find that the trial court did not abuse its discretion in concluding that Schwendeman failed to demonstrate that the commonality and predominance prerequisites to a class action existed. The trial court's conclusion is based on tenable grounds and is not manifestly unreasonable.
Superiority
The trial court found that Schwendeman failed to prove, pursuant to CR 23(b)(3), that a class action is superior to other available methods for fair and efficient adjudication. Factors pertinent to a finding that a class action is superior include the desirability or undesirability of concentrating the litigation of the claims in the particular forum and the difficulties likely to be encountered in the management of a class action.[47]
Schwendeman argues that a class action is superior because: (1) it would be inefficient for the court to engage in individual trials on the same liability issue, (2) the typical claim *11 is too small to warrant an individual insured to maintain his or her own lawsuit, and (3) no management difficulties would arise with respect to maintaining a class action.
USAA argued below and on appeal that a class action is not superior because there are a large number of individualized issues that pertain only to individual class members and, accordingly, the court would have to undertake a large number of separate trials. Also with respect to the superiority requirement, USAA presented evidence that it warrants non-OEM parts for the remainder of the vehicle's warranty or three years from the date of repair, whichever is longer. USAA argues that this warranty, together with the binding appraisal clause in USAA's policy, provide a more efficient, less expensive means for an insured to resolve a dispute regarding the use of non-OEM parts.
As discussed, by the terms of the USAA policy, a large number of individual issues will be involved in the resolution of whether USAA breached its contractual obligation by using non-OEM parts. With so many individual inquiries, involving the large number of crash parts and insureds living across the state, the trial court's decision that a class action would be difficult and unruly to manage is not untenable or manifestly unreasonable.[48] Given the evidence presented to the trial court on the superiority requirement, the court's decision that the requirement was not met is not an abuse of discretion.
For the foregoing reasons, we affirm the trial court.
COLEMAN, J., and APPELWICK, J., concur.
NOTES
[1] RCW ch. 19.86.
[2] The Insurance Commissioner reviewed USAA's policy to ensure it conforms to the laws and regulations in the State of Washington.
[3] CP 41.
[4] CP 41. Although the policy does not define "permitted by law," it likely refers to WAC 284-30-390(8), which relates to the standards for settlement of automobile insurance claims. WAC 284-30-390(8) provides that deductions for depreciation are permitted only for parts normally subject to repair and replacement during the useful life of the insured vehicle. The regulation also provides for the method by which the amount of depreciation is to be calculated.
[5] On its website, in response to the question "Can they use non-brand-name parts or used parts?" the Insurance Commissioner states: "The company owes you repair or replacement with like kind and quality parts, not necessarily new parts. If the parts and repairs are guaranteed by the repair shop, and are in the same condition as the parts damaged, they conform to the repair requirements. If you insist on certain parts you may have to pay the additional cost."
[6] CP 205. The motion for class certification defines "non-OEM `crash' parts" as: "Replacement bumpers, grilles, hoods, fenders, doors and other sheet metal parts made by manufacturers other than the original equipment manufacturer or their authorized suppliers." CP 205.
[7] The parties agreed Schwendeman would file his response a week following argument. The argument before the trial court focused more on the requirements of CR 23 and issues related to class certification, than on the experts' opinions and conclusions.
[8] CP 1281.
[9] These requirements are set forth in full below.
[10] CP 1417.
[11] CP 1282.
[12] The judgment provides:

1. Pursuant to the parties' agreement, plaintiff's individual claims are dismissed with prejudice.
2. The Court's October 20, 2000 Order Granting Defendant's Motion to Strike Declarations of Paul Griglio and Charles Kendall Clarke, and the Court's March 9, 2001 Revised Order Denying Plaintiff's Motion for Class Certification, are attached hereto and incorporated into this Final Judgment, and plaintiff's class claims are dismissed with prejudice. CP 1284.
[13] See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 402, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (A class action plaintiff presents two separate issues for judicial resolution: the plaintiff's claim on the merits and the plaintiff's claim that he or she is entitled to represent a class. The interest in having a class certified is more analogous to the private attorney general concept than the concept of having a "personal stake" in the outcome of litigation, which is the interest underlying an individual claim on the merits.).
[14] Id. 445 U.S. at 404, 100 S.Ct. 1202.
[15] Love v. Turlington, 733 F.2d 1562, 1565 (11th Cir.1984).
[16] Toms v. Allied Bond & Collection Agency, Inc., 179 F.3d 103 (4th Cir. 1999).
[17] CR 23(a).
[18] These three requirements are:

(1) The prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
CR 23(b).
[19] Brown v. Brown, 6 Wash.App. 249, 256, 492 P.2d 581 (1971).
[20] DeFunis v. Odegaard, 84 Wash.2d 617, 622, 529 P.2d 438 (1974).
[21] Id., 84 Wash.2d at 622, 529 P.2d 438.
[22] Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); Oda v. State, 111 Wash.App. 79, 93, 44 P.3d 8, review denied, 147 Wash.2d 1018, 56 P.3d 992 (2002).
[23] Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wash.2d 40, 47, 905 P.2d 338 (1995).
[24] Id., 128 Wash.2d at 47, 905 P.2d 338. Because CR 23 is identical to its federal counterpart, Fed.R.Civ.P. 23, federal cases interpreting the analogous federal provision are highly persuasive. Pickett v. Holland America Line-Westours, Inc., 145 Wash.2d 178, 188, 35 P.3d 351 (2001), cert. denied, 536 U.S. 941, 122 S.Ct. 2624, 153 L.Ed.2d 806 (2002).
[25] Sorrel v. Eagle Healthcare, Inc., 110 Wash. App. 290, 300, 38 P.3d 1024, rev. denied, 147 Wash.2d 1016, 56 P.3d 992 (2002).
[26] CP 1282.
[27] King v. Riveland, 125 Wash.2d 500, 519, 886 P.2d 160 (1994) (quoting Brown, 6 Wash.App. at 255, 492 P.2d 581), superseded by statute on other grounds as stated in In re Dependency of Q.L.M., 105 Wash.App. 532, 20 P.3d 465 (2001); see also, Oda, 111 Wash.App. at 90, 44 P.3d 8.
[28] In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir.1996).
[29] Amchem Products, Inc. v. Windsor, 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).
[30] 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 at 227 (2d ed.1986).
[31] Amchem Products, 521 U.S. at 623, 117 S.Ct. 2231.
[32] (Internal quotations omitted.) Smith v. Behr Process Corp., 113 Wash.App. 306, 323, 54 P.3d 665 (2002).
[33] "It is my opinion that imitation parts are globally inferior to OEM metal crash parts for several reasons." Clarke declaration, CP 502. "[A]ll non-OEM crash parts are uniformly and categorically inferior to comparable OEM crash parts." Griglio declaration, CP 524. We address later in this opinion the trial court's order rejecting these opinions and striking parts of these experts' declarations.
[34] While a court may not, in determining whether to certify a class, conduct a preliminary inquiry into the merits, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the court is free to look beyond the pleadings to determine whether the requirements of CR 23 have been met. Oda, 111 Wash.App. at 93, 44 P.3d 8. "`Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issue.'" Id. at 94, 44 P.3d 8 (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996)). Accordingly, it is proper for the court to consider all the evidence in the record, including the conflicting expert testimony, relevant to the issue of whether the requirements of CR 23 were met.

We note that this record contains evidence that rebuts Clarke's and Griglio's assertion that no non-OEM part can ever be of like kind and quality to an OEM part. According to Wendell Blakely, a body shop manager, the quality of a particular non-OEM part varies widely depending on the type of part and its manufacturer. In fact while some non-OEM parts are of lesser quality than comparable OEM parts, some non-OEM parts are of equal or better quality. Blakely also states that whether a non-OEM part is of like kind and quality to an OEM part additionally depends on the age, condition, mileage, make, and model of the vehicle being repaired, the condition and manufacturer of the part that is being replaced, and the skill of the individual doing the repairs.
USAA also presented a declaration of Michelle Vogler, Ph.D. She states that she is unaware of any scientific support for the experts' assertion that all non-OEM parts are inferior to OEM parts. Dr. Vogler also states that automobile companies routinely outsource the production of parts to non-OEMs, that non-OEMs are capable of producing OEM parts, and that it is possible and commonplace to reverse-engineer an OEM part.
[35] According to USAA's expert, the class claims would put at issue over 33,444 separate and unique non-OEM crash parts.
[36] CP 1281. The trial court granted in part the motion to strike the experts' opinions and conclusions based on this conclusion.
[37] 321 Ill.App.3d 269, 746 N.E.2d 1242, 254 Ill.Dec. 194 (2001), appeal allowed, 201 Ill.2d 560, 786 N.E.2d 180 (2002).
[38] The trial court in that case entered a $1.18 billion judgment against State Farm. The intermediate appellate court affirmed in all respects but for the award of disgorgement damages. The Illinois Supreme Court allowed an appeal in the case on October 2, 2002, and review is currently pending.
[39] Notably, in concluding that the commonality requirement was met, the court in Avery stated: "The fact that a different conclusion might be arguable does not diminish the deference we must give to [the] decision of the trial court" under the abuse of discretion standard of review. Avery, 254 Ill.Dec. 194, 746 N.E.2d at 1253. The same reasoning applies here. That is, even if we reach a different conclusion from the trial court's on the commonality requirement, there are tenable grounds to support the trial court's conclusion and it is not manifestly unreasonable.
[40] The Avery court stated:

State Farm devised a nationwide policy mandating the use of non-OEM parts in its insureds' property-damage claims if those parts were cheaper and available. It also established uniform procedures to implement that policy, while simultaneously denying its claims estimators any discretion to substitute OEM parts for non-OEM parts.
Id. at 1253.
[41] CP 397. Jay DeBeor, a physical damage operations manager for USAA, stated in a declaration:

Regional Directors of Physical Damage are informed of the USAA guidelines on the specification of non-OEM parts developed by Auto Claims Policy. Each Regional Director, however, has considerable discretion as to how to best implement the guidelines in keeping with USAA's goal of member service and customer satisfaction. Regional Physical Damage Operation Managers, physical damage managers and physical damage specialists have been empowered to make decisions as to the appropriateness of a particular replacement part on a case-by-case basis.
Thus, particular practices with respect to the use of non-OEM parts vary by region, by field office, by unit, and by appraiser. These variations are compounded when the individual discretion of staff appraisers, and independent appraisers is taken into account, not to mention the discretion of claims representatives and their managers, and finally that of repair shops and individual customers.
It is therefore extremely difficult, if not impossible, to identify an absolute, across-the board practice at USAA regarding the specification of non-OEM parts in repair estimates. Each claim is handled on a case-by-case basis considering the factors unique to each claim.
CP 397.
[42] Avery, 254 Ill.Dec. 194, 746 N.E.2d at 1256.
[43] The trial court concluded class certification was not a superior method to adjudicate this controversy and there were alternative methods available.
[44] See Oda, 111 Wash.App. at 94, 44 P.3d 8; Eisen, 417 U.S. at 177, 94 S.Ct. 2140. There is a significant difference between considering all the evidence in the record, including conflicting expert testimony, in order to determine whether the requirements of CR 23 have been met and weighing conflicting testimony. The trial court is free to do the former, see note 36, supra, but may not do the latter.
[45] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." ER 702.

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." ER 703.
[46] See In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 135 (2d Cir.2001), cert. denied, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002).
[47] CR 23(b)(3).
[48] We reject Schwendeman's argument that the trial court's decision to strike his experts' declarations precluded him from establishing superiority, We note he introduced these declarations with his reply to the motion for class certification, and he did not cite or rely on them in support of his argument on the superiority requirement.