IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HANNAH HONG FRELOT,<br><br>                    Appellant,<br><br>          v.<br><br>JACKSON DARGIE,<br><br>                    Respondent. | No. 88757-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Hannah Frelot appeals the denial of her petition for a domestic violence protection order (DVPO) against Jackson Dargie, arguing the trial court erred when it found she had not proved by a preponderance of the evidence that Dargie unlawfully harassed and exercised coercive control over her. We disagree and affirm.

## FACTS

Frelot and Dargie met several years ago at work and began an on-again, off-again relationship. This relationship ended March 1, 2025. On May 19, 2025, Frelot filed a petition for a DVPO against Dargie. At the time she filed the petition, the two apparently lived near one another.[1] She recounted past incidents which included threats of suicide, patterns of gender discrimination and "hateful, aggressive speech," and a time when Dargie came to her apartment uninvited. She also suspected that he was responsible for writing a harassing message that appeared on her car given "his

---

[1] In her petition, Frelot discussed Dargie's residence being approximately 900 feet away from hers.

constant alcohol use, flagrant disregard of boundaries, behavioral and speech patterns, proximity and opportunity."

The court issued a temporary protection order (TPO) on May 20 and set a full hearing for June 3. Dargie did not appear for the June 3 hearing, and the court issued a one-year DVPO by default.

On June 25, Dargie moved to vacate and terminate the DVPO, asserting improper service. Dargie also submitted a sworn declaration that addressed some of the incidents Frelot recounted in her original petition. A commissioner heard the motion to vacate on July 24. The commissioner found good cause to vacate and held a full hearing on the merits of the petition. After hearing testimony from Frelot, reviewing the parties' declarations, and considering arguments, the commissioner denied the petition, concluding that there was "not sufficient evidence that [Dargie's] conduct rose to the level of unlawful harassment or coercive control."

On August 1, Frelot filed a "motion for reconsideration and revision," arguing the commissioner "misapplied the governing law—particularly the definitions of domestic violence under RCW 7.105, including *coercive control* and *unlawful harassment*—and overlooked or misinterpreted critical evidence." The motion included a comparison between Dargie's signature and a harassing message that had been scrawled on Frelot's car that was alleged to have been perpetrated by Dargie. On September 5, a superior court judge denied the motion for revision and adopted the commissioner's ruling. The court specifically noted that, on a motion to revise, it may not consider new evidence that was not considered by the commissioner.

Frelot timely appeals.

## DISCUSSION

Frelot argues that the trial court erred when it denied her petition, as Dargie's behavior clearly satisfied the definitions of "coercive control" and "unlawful harassment" as recognized under the civil protection orders statute, RCW 7.105.010(10)(a).

### I.    DVPO

We review the denial of a DVPO for abuse of discretion. Rodriguez v. Zavala, 188 Wn.2d 586, 590, 398 P.3d 1071 (2017). A trial court abuses its discretion if its decision is based on untenable grounds or reasons or is otherwise manifestly unreasonable. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). A decision based "on an erroneous view of the law" is necessarily an abuse of discretion. Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). "Our review focuses on the actions of the trial court, rather than the commissioner, because a trial court's order on a motion for revision supersedes any rulings by a commissioner." Matter of Timaeus, 34 Wn. App. 2d 670, 678, 574 P.3d 127 (2025). "When a trial court denies a motion for revision, it adopts the commissioner's findings, conclusions, and rulings as its own." Id. at 678-79.

"We review a trial court's findings of fact for substantial evidence, generally deferring to the trier of fact on questions of witness credibility, conflicting testimony, and persuasiveness of the evidence." Id. at 679. "Evidence is 'substantial' when it is 'sufficient to persuade a fair-minded person of the truth of the matter asserted.' " In re

Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017) (quoting In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014)).

RCW 7.105.225(1)(a) establishes that a court "shall issue a protection order if it finds by a preponderance of the evidence that the petitioner has been subjected to domestic violence by the respondent." Domestic violence includes "coercive control" and "unlawful harassment." RCW 7.105.010(10)(a).

" 'Coercive control' means a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." RCW 7.105.010(4)(a). When determining "whether the interference is unreasonable, the court shall consider the context and impact of the pattern of behavior from the perspective of a similarly situated person." Id. Examples of coercive control include "controlling or compelling conduct by . . . communicating, directly or indirectly, the intent to . . . attempt suicide or other acts of self-harm." RCW 7.105.010(4)(a)(i)(E).

" 'Unlawful harassment' means . . . a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, harasses or is detrimental to such person, and that serves no legitimate or lawful purpose." RCW 7.105.010(37)(a). The "course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." Id. The statute defines "course of conduct" as a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a

4

continuity of purpose." RCW 7.105.010(7)(a). Further, the statute identifies considerations for the court in applying these definitions:

> In determining whether the course of conduct serves any legitimate or lawful purpose, a court should consider whether:
>
> (i) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;
>
> (ii) The respondent has been given clear notice that all further contact with the petitioner is unwanted;
>
> (iii) The respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner;
>
> . . .
>
> (v) The respondent's course of conduct has the purpose or effect of unreasonably interfering with the petitioner's privacy or the purpose or effect of creating an intimidating, hostile, or offensive living environment for the petitioner.

RCW 7.105.010(7)(b)(i)-(iii), (v).

In Frelot's petition, she noted a series of incidents that caused her to seek the protection order. First, she described an incident in August 2023 in which Dargie threatened to kill himself "via hanging" and "had a plan in place for who was going to take care of his cats." This caused Frelot concern, and she asked their work manager to check on him. During that time, he also called one of Frelot's friends "some bitch/that bitch." Frelot described this interaction as the start of a "pattern of gender discrimination" and "hateful, aggressive speech."

Frelot also described a phone call around February 2024 during which Dargie berated her, saying she was "pathetic" and "a child." She elaborated that throughout the

relationship Dargie made "racist statements about Asians . . . and Black people" and shared that she is Asian and her children are "Black/Asian."

Frelot recounted an incident on June 1, 2024, where Dargie came to her apartment between the hours of 2 a.m. and 3 a.m. and rang her apartment buzzer 10 times. She did not answer, and she stated she "did not ask him to come over." He then apparently called her phone at least 17 times until she turned her phone off, and he then buzzed her door at least 3 more times and "buzzed all the neighbors in her building . . . until one had had enough and yelled out their window for him to leave[,] which he did."

In October 2024 Dargie again came to her apartment and "buzzed" the door incessantly. Around this time, he also threatened to kill himself again and had told Frelot that he had a gun. She stated that she was "concerned for his safety" but did not want "at that point to resume contact with him," so she reported the incident to the Seattle Police Department. She also described two incidents when her car appeared to be vandalized. The first incident happened around April 2025, where the message, "I am gay fuck me in the ass with a BBC" was written on her rear window. The next time there was "jelly, foil, and a broken deli service container" left on her car.

In response to Frelot's DVPO petition, Dargie submitted a declaration. He agreed that the June 2024 door buzzing incident happened but explained that it happened in the context of their dynamic, as he understood it. He stated that blocking each other's phones was "part of [their] dynamic," and that Frelot had "told [him] she did this so that [he] would come over to her apartment to have sex." He also attested that "when she

6

did this, [he] would often go over to her apartment and [they] had sex," and that "she never told [him] to stop coming over." He also agreed that he had been "very depressed the last few years" and "did think about suicide," which he shared with Frelot.

Dargie also stated that the two did "occasionally" have arguments "where [they] said mean things to each other," but he did not remember the call she recounted in her petition and denied saying she was "pathetic." He also denied making any of the racist statements that Frelot alleged. Finally, he denied writing or smearing food on Frelot's car, highlighting that the "alley is open to the public and many people walk through it 24 hours a day."

During the hearing on the merits, Frelot provided additional testimony. She disagreed that her blocking Dargie on the phone was an invitation to come over. Despite this, he would "still come over," and Frelot interpreted his coming over as a way for him to "calm [her] back into a relationship." She specified that she permitted him to come in because she was concerned that he would otherwise "buzz" the whole building. In response to questioning by the court, Frelot agreed that after the June 2024 incident, the two remained friendly in an "on again, off again" way. When asked if she had ever given any "clear indication to [Dargie] that [she] wanted no further contact," Frelot responded yes, in "February of 2025." On redirect, Frelot elaborated that she told Dargie "multiple times that [she] [didn't] want to see him or talk to him," which included times when she blocked him.

The court also asked Frelot about Dargie's suicide threats. Frelot agreed that the threats appeared to be legitimate but stated that she believed the purpose of the threats

was to "manipulate sympathy out of [her] and make him the focus of the relationship." The commissioner asked her to elaborate, and she stated,

> He actually admitted to me once before on the phone that he was thinking of killing himself and then he followed it up with, Oh, it's manipulative of me to say that. But I was also scared that he would do it. Obviously, I cared for him. So I did call the police multiple times when he seemed very serious and had a plan. And I also contacted our old supervisor in common saying, I'm worried about him. Can you check in on him? Even though I didn't want any more contact with him.

The court then issued its oral ruling, specifying that the actions in the case fell under either the category of "unlawful harassment" or "coercive control." The commissioner recognized that the June 2024 incident could qualify, however short, as a course of conduct recognized in the "unlawful harassment" definition. But the commissioner noted an issue concerning the parties breaking up and coming back together as it related to the analysis. Therefore, the commissioner focused on the last time Frelot had provided a clear and direct indication that she wanted no further contact, which was in February 2025. The only incidents Frelot alleged following February 2025 concerned vandalism to her car, as to which the commissioner stated there was insufficient evidence to determine that Dargie was responsible. The commissioner recognized that there "may be some similarities in handwriting, but I'm not a handwriting expert," and that they "really [didn't] think that's sufficient to determine that [Dargie] was responsible." Accordingly, the commissioner concluded that Frelot had not proved unlawful harassment by a preponderance of the evidence.

The commissioner also analyzed whether Frelot had proved by a preponderance of the evidence that Dargie exercised "coercive control" over her via "threats of suicide"

and "psychological aggression." The commissioner stated that "the most important question" to them was whether the threats of suicide were "a legitimate threat because someone was depressed or was this a threat to . . . cause [Frelot] to do something." The commissioner determined that based on the evidence, the threats appeared to be legitimate and "not necessarily used to cause [Frelot] to suffer physical, emotional or psychological harm." Regarding psychological control, the commissioner noted there was insufficient evidence to determine whether the alleged comments or statements Dargie made were done with the intent to cause Frelot to suffer psychological harm or with the purpose or effect of unreasonably interfering with Frelot's free will and personal liberty.

### A. Unlawful Harassment

Frelot contends that the trial court misapplied the law of unlawful harassment, specifically concerning the incidents when Dargie appeared at Frelot's home uninvited. Frelot argues that the court was incorrect to consider "periods of reconciliation between these incidents," Frelot's failure to "immediately" seek a protection order, and Frelot's apparent acquiescence to Dargie's "intrusions." Frelot argues these were legal errors and that the commissioner's conclusions were not supported by the evidence. We disagree.

"The court may not deny . . . a petition . . . on the grounds that . . . the conduct at issue did not occur recently or because the passage of time since the last incident." RCW 7.105.225(2)(e). Thus, Frelot is correct that "timing is legally irrelevant" to the court's considerations. Frelot is also correct that "reconciliation does not negate

9

harassment." However, the commissioner's ruling was not dependent solely on the apparent passage of time between the events and Frelot seeking the petition or reconciliation of the parties. Rather, the commissioner's analysis incorporated in some of the factors to be considered when determining whether Dargie engaged in a "knowing and willful course of conduct directed at" Frelot "that seriously alarms, annoys, harasses, or that was detrimental to her." RCW 7.105.010(37)(a).

In determining whether a course of conduct serves a legitimate purpose, the court should consider whether the current contact was initiated by only Dargie or both Frelot and Dargie, whether Frelot had given clear indication that further contact was unwanted, whether Dargie's course of conduct appeared designed to alarm, annoy, or harass Frelot, or if Dargie's course of conduct had the purpose or effect of unreasonably interfering with Frelot's privacy or creating an intimidating, hostile, or offensive living environment. RCW 7.105.010(7)(a)(i)-(iii), (v). Here, the evidence was conflicting concerning whether Dargie knowingly and willfully engaged in a pattern of visiting Frelot uninvited to alarm, annoy, harass, or be detrimental to her, as he described her blocking him as a pattern of the relationship, while she expressed it as a clear indication for him to stay away. Similarly, Frelot provided testimony that indicated this pattern was unwelcome but also acknowledged that the two were intermittently friendly during the times when Dargie visited her apartment. Given that we defer to the trier of fact on questions of credibility, conflicting testimony, and persuasiveness of the evidence, see Timaeus, 34 Wn. App. 2d at 679, the commissioner did not err when they considered this conflicting information and determined there was not sufficient evidence to establish

Dargie engaged in unlawful harassment when he visited Frelot's apartment in June and October 2024.

Frelot also contends that the trial court erred when it "disregard[ed] evidence of property damage," "summarily dismissed" the incident as unproven, and refused "to consider relevant circumstantial evidence." Specifically, she argues that "the trial court refused to consider this evidence" and "declined to even look at the proffered comparison." However, the record does not reflect such a refusal.

After Dargie submitted his motion to vacate, Frelot submitted a written response, arguing—among many things—that the incident involving the lewd message on the car was "more likely than not" perpetrated by Dargie. She argued that the message "track[ed]" with prior racialized insults towards her and her biracial children and that a side-by-side letter comparison to Dargie's signature confirmed the suspicion.[2] She did not include a sample of his signature at that time, though she later attached one to her motion to revise and reconsider, which the revision court did not consider. The evidence regarding the timing of the incident indicated that it happened shortly after the two stopped seeing each other while they lived near one another, and that only Frelot's car was vandalized. At the start of the hearing, the commissioner confirmed that they had reviewed "everything in this case file." Later, the commissioner asserted that there was not sufficient evidence to determine that Dargie was responsible for vandalizing Frelot's

---

[2] In her brief on appeal, she further explains her theory that "BBC" is "commonly understood to mean 'Big Black Cock' . . . [and] is a bizarre detail for a random act of vandalism but is telling given [Dargie's] knowledge and biases" against Frelot, as an Asian woman with two half-Black children and, is a "highly specific, targeted insult that points to [Dargie's] mindset." App. Br. at 29.

car, even if the handwriting appeared similar.[3] Accordingly, the record does not reflect a flat refusal to consider the evidence, but rather, that it was insufficient to prove Dargie was the perpetrator. And because this court will not disturb a lower court's discretion in this regard unless there is a clear showing of abuse, there was no error. See Schwendeman v. USAA Cas. Inc. Co., 116 Wn. App. 9, 24 n.39, 65 P.3d 1 (2003) (" 'The fact that a different conclusion might be arguable does not diminish the deference we must give to [the] decision of the trial court' under the abuse of discretion standard." (quoting Avery v. State Farm Mut. Auto. Ins. Co., 746 N.E.2d 1242 (2001))).

B. Coercive Control

Frelot also argues that the trial court misapplied the law of coercive control because the "trial court's analysis failed to consider either the purpose or the effect of these threats on" Frelot. In particular, Frelot contends the commissioner created "a false dichotomy" between legitimate expressions of depression and acts of manipulation. We disagree.

Here, Frelot is again correct that the statute does not create a difference between feigned or legitimate suicidal threats when considering whether the action qualifies as "coercive control." Indeed, one could make a legitimate threat of suicide or self-harm

---

[3] . During their oral ruling, the commissioner stated,

I don't have sufficient evidence to determine that [Dargie] was actually responsible for [the car vandalism]. [Dargie]'s indicating that he was not. I understand that there may be some similarities in handwriting, but I'm not a handwriting expert. And I really don't think that's sufficient to determine that [Dargie] . . . was responsible. So in terms of unlawful harassment, I . . . don't think that I have sufficient evidence to find by a preponderance of the evidence that unlawful harassment occurred.

12

that is still used to cause another to suffer, and in purpose or effect unreasonably interfere with a person's free will and personal liberty within the meaning of RCW 7.105.010(4)(a). Frelot contends the commissioner misapprehended the law, focusing on the commissioner's statement that "the most important question . . . to me is, was this a legitimate threat because someone was depressed or was this a threat to use to cause the petitioner to do something that they wanted to do?" However, the commissioner also went on to state that "based on the evidence, it appears to the Court that these were legitimate threats of suicide, not necessarily used to cause the petitioner to suffer physical, emotional or psychological harm." Furthermore, after the commissioner delivered their oral ruling, Frelot directly asked if they were considering whether the concepts were "mutually exclusive, that if it's genuine, therefore it's not controlling," to which the court again responded there was not "sufficient evidence that it was intended as an act of coercive control." Thus, the record does not reflect that the commissioner misapprehended the law and thereby abused their discretion.

Furthermore, it was not an abuse of discretion for the commissioner to conclude Frelot had not met her burden of proving coercive control. Frelot testified that Dargie's suicidal threats had an effect on her that interfered with her decision-making regarding the relationship, i.e., eliciting sympathy. But the first portion of the statute requires showing a "pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm." RCW 7.105.010(4)(a). And here, while both parties acknowledged Dargie was depressed, the evidence was conflicting as to the purpose of him sharing his suicidal ideation. Frelot considered it as a means for Dargie to elicit

13

sympathy and to subsequently manipulate her, while Dargie described it as sharing his mental health issues. Again, this court defers to the trier of fact to resolve conflicting testimony and the persuasiveness of evidence. Accordingly, the commissioner did not err when they determined there was insufficient evidence to prove that Dargie threatened suicide as a pattern of behavior to cause Frelot to suffer physical, emotional, or psychological harm.

## II. Attorney Fees

Frelot and Dargie each request attorney fees on appeal. RAP 18.1 allows a party to request attorney fees on appeal where applicable law allows. Under RCW 7.105.310(1)(j), courts have discretion to "reimburse the petitioner for costs incurred in bringing the [DVPO] action, including reasonable attorneys' fees." Because Frelot's appeal is unsuccessful, we decline to award her fees on appeal.

Separately, Dargie requests fees under RAP 18.9, arguing Frelot's appeal is frivolous. Under RAP 18.9(a), a party is subject to sanctions if they file a frivolous appeal. As this court has explained,

> An appeal is frivolous if there are no debatable issues on which reasonable minds might differ and is so totally devoid of merit that there is no reasonable possibility of reversal. All doubts as to whether the appeal is frivolous should be resolved in favor of the appellant. An appeal that is affirmed simply because the arguments are rejected is not frivolous.

In re Marriage of Schnurman, 178 Wn. App. 634, 644, 316 P.3d 514 (2013). Dargie has not shown that there are no debatable issues on which reasonable minds might differ and that the arguments are so totally devoid of merit that there is no reasonable

possibility of reversal. Because all doubts as to whether the appeal is frivolous should be resolved in favor of Frelot, we deny Dargie fees under RAP 18.9.

## CONCLUSION

We affirm.

_Chung, J._

WE CONCUR:

_Díaz, J._

_Smith, J._